UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RONALD L. ROSE,                          )
                                         )
                    *Plaintiff*,         )
                                         )
        v.                               )        No. 1:23-cv-01822-JMS-KMB
                                         )
JOHN HEFLIN,                             )
DAVID GOBBER,                            )
KATE WILKS,                              )
CENTURION HEALTH SERVICES, LLC, and      )
STEPHANIE RILEY DR.,                     )
                                         )
                    *Defendants*.        )

## ORDER

Plaintiff Ronald Rose has long suffered from asthma and allergies. As a prisoner with the Indiana Department of Correction ("IDOC") in various facilities, he claims that the Defendants were deliberately indifferent to his serious medical needs by ignoring medical specialists, doggedly pursuing ineffective treatment, and delaying his medical care, all of which allegedly left him to languish while coughing up blood. Defendants have filed a Motion for Summary Judgment and to Relinquish Supplemental Jurisdiction, [Filing No. 90], and Mr. Rose has filed multiple motions, including a Motion for Preliminary Injunction, [Filing No. 111], a Motion to Reconsider, [Filing No. 114], and a Motion for a Permanent Injunction, [Filing No. 116.] Each is ripe for the Court's review.

## I.
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A.    Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact, so that as a matter of law, the moving party is

entitled to judgment. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "Summary judgment is not a time to be coy." *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted supporting or opposing a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). Each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* Only the cited materials must be considered by the Court; the Court need not "scour the record" for potentially relevant evidence. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts do not affect the outcome.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In case concerning a defendant's alleged deliberate indifference to a prisoner's serious medical needs, the defendant's state of mind is an "inquiry that ordinarily cannot be concluded on summary judgment." *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 597-98 (7th Cir. 1991)).

### B.    Statement of Facts

#### 1.    *Mr. Rose Experiences Asthma and Allergies from a Young Age Into Adulthood*

Mr. Rose has long battled with asthma, diagnosed at age five.  [Filing No. 97 at 1.]  When he was ten years old, he had a major asthma attack and was pronounced dead on arrival.  [Filing No. 97 at 1.]  Throughout his childhood, he was hospitalized for his asthma "well over 20 times." [Filing No. 97 at 1.]  In adulthood, he was hospitalized for his asthma "approximately 10 times," "was regularly receiving at least an Albuterol rescue inhaler for his asthma symptoms," and had received allergy shots.  [Filing No. 91-3 at 1; Filing No. 91-1 at 31; Filing No. 97 at 2.]  Mr. Rose was a "former smoker" but has "not smoked since December 29, 2019."  [Filing No. 97 at 2.]

#### 2.    *Upon Entering IDOC, Mr. Rose's Asthma is Mild*

Mr. Rose was incarcerated in IDOC on April 4, 2011, at age 26 and has been in and out of IDOC in the years since then.  [*See* Filing No. 91-2 at 343; Filing No. 1-1 at 207.]  On December 4, 2020, Mr. Rose was taken to IDOC's Reception Diagnostic Center, where his asthma symptoms

were evaluated. [Filing No. 1-1 at 47.] The examining doctor conducted a "peak flow test," which "show[s] the volume and rate of air that can be forcefully breathed out of the lungs. . . . During the test, [the patient] blow[s] forcefully into the mouthpiece of a device" to collect a measurement. [Filing No. 1-1 at 49.][1] Mr. Rose's highest peak flow rate was 670 liters per minute. [Filing No. 1-1 at 49.] The examining doctor concluded that at the time, Mr. Rose's asthma showed "no associated symptoms" and was "mild" and "intermittent." [Filing No. 1-1 at 47.]

Starting in December 2020, Mr. Rose was incarcerated in the Correctional Industrial Facility ("CIF"). [Filing No. 97 at 2.] On May 7, 2021, Mr. Rose visited another physician, who concluded that his condition had worsened, now classifying his asthma as mild but "persistent." [Filing No. 1-1 at 52.] Testing revealed a peak flow rate between 400 and 628 liters per minute, a lower rate than the examination the prior December. [Filing No. 1-1 at 53-54.] At this appointment, the doctor noted that Mr. Rose was previously diagnosed with Chronic Obstructive Pulmonary Disease ("COPD") after having worked in a coal mine. [Filing No. 1-1 at 54.] Mr. Rose continued to receive asthma treatment for the remainder of that year, and on December 21, 2021, doctor's notes from a chronic care visit show that his symptoms "stabilized" due to a "beta-agonist/anti-cholinergic inhaler and steroid inhaler." [Filing No. 96 at 23.]

A few months later, on March 7, 2022, Mr. Rose attended a nurse visit, which revealed he had "[d]iminished lung sounds." [Filing No. 38-2 at 56.] His peak flow rate ranged from 450 to a high of 500 liters per minute. [Filing No. 38-2 at 56.] This was lower than the peak flow rate of 628 the prior March. [Filing No. 38-2 at 56; Filing No. 1-1 53-54.]

---

[1]    *Peak Flow Measurement*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/peak-flow-measurement (defining peak flow) (last visited July 17, 2025).

### 3. Mr. Rose's Health Begins to Worsen Under Dr. Heflin's Care

On June 1, 2022, Mr. Rose began receiving medical care from his new primary care physician, Defendant John Heflin, a doctor a CIF. [Filing No. 91-3 at 1.]

Starting in April 2022, Mr. Rose was prescribed multiple medications to manage his asthma. [Filing No. 91-1 at 31.] Those medications included an AirDuo RespiClick, which is an inhaler; albuterol sulfate, another inhaler; ipratropium, which is a medicine that is nebulized into a mist that the patient inhales; Nasacort, which is an allergy nasal spray; and Singulair, which is an allergy pill. [Filing No. 91-1 at 31-32.]

By August 23, 2022, Mr. Rose's condition was still not improving. [Filing No. 96 at 46.] In fact, Dr. Heflin wrote that Mr. Rose's "symptoms ha[d] worsened." [Filing No. 96 at 46.] Mr. Rose's associated symptoms included shortness of breath with intense exercise, "excessive sputum," "productive cough," and "wheezing." [Filing No. 96 at 46.] Dr. Heflin examined Mr. Rose, and a medical assistant documented his "[o]bjective findings" to state that Mr. Rose had "[w]orsening asthma despite treatment with AirDuo, albuterol, singulair, and nasacort." [Filing No. 91-1 at 31.] Dr. Heflin "request[ed] [a] referral to [an] allergist for evaluation" that same day. [Filing No. 91-1 at 31; Filing No. 96 at 49.]

### 4. Allergist Dr. Leena Padhye Diagnoses Mr. Rose with Severe Persistent Chronic Asthma

On October 24, 2022, Mr. Rose was examined by Dr. Leena Padhye, an allergy and asthma specialist. [Filing No. 38-2 at 65.] Dr. Padhye tested Mr. Rose's skin to confirm his many allergies. [Filing No. 38-2 at 66.] She observed that Mr. Rose had "decreased aeration with expiratory wheezing." [Filing No. 38-2 at 65.] She also noted that Mr. Rose was not a smoker. [Filing No. 38-2 at 68.] She evaluated Mr. Rose's lungs using several tests, including a forced expiratory

volume test, ("FEV"), which "measures how much air a person can exhale during a forced breath."[2] [Filing No. 38-2 at 68.]  A normal value of predicted lung function would range between 77-87%. [Filing No. 96 at 259.]  But when Mr. Rose forcefully exhaled for one second ("FEV1"), he produced only as low as 55% of the expected volume of air.  [Filing No. 38-2 at 68.]  Dr. Padhye determined that Mr. Rose had a moderate risk of COPD.  [Filing No. 38-2 at 68.]  She determined further that although Mr. Rose was only 36 years old, his "lung age" was 79 years old.  [Filing No. 1-1 at 68.]

In Dr. Padhye's Practitioner Consultation Report, she concluded that Mr. Rose suffered from "severe persistent chronic asthma" and "severe allergic sensitization."  [Filing No. 38-2 at 65-70.]  Treating his asthma would "require intermittent monitoring with breathing tests (spirometry[3] & FeNO),[4] exam[s], and medication management based on [the] clinical course and objective data."  [Filing No. 38-2 at 65.]  To treat Mr. Rose's allergies, Dr. Padhye recommended "allergen immunotherapy."  [Filing No. 38-2 at 70.]  Dr. Padhye prescribed Mr. Rose a new slate of medications, including Spiriva Respimat, which is an inhaler; Cetirizine, which is an allergy medication; Azelastine, which is an allergy nasal spray; and Nucala, which is an injected medicine

---

[2] *Forced Expiratory Volume and Forced Vital Capacity*, University of Michigan Health, https://www.uofmhealth.org/health-library/aa73564/1000 (last visited July 17, 2025).

[3] "Spirometry is a type of pulmonary function test.  It determines how well your lungs work by measuring how much air goes into and out of your lungs when you breathe."  *Spirometry*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/17833-spirometry (last visited July 17, 2025).

[4] "FeNO stands for fractional exhaled nitric oxide.  When you breathe out, your breath can show if you have inflamed airways.  A FeNO test measures the amount of nitric oxide in your breath. This test helps doctors tell if and how much inflammation you have in your airways."  *FeNO Tests to Monitor FeNO Levels*, Asthma and Allergy Foundation of America, https://aafa.org/asthma/asthma-diagnosis/lung-function-tests-diagnose-asthma/feno-tests-to-monitor-feno-levels/ (last visited July 17, 2025).

to treat severe asthma.  [Filing No. 38-2 at 70.]  She noted, though, that "equivalent medication substitution [could] be used."  [Filing No. 38-2 at 65.]  Dr. Padhye recommended following up with her within six months.  [Filing No. 38-2 at 65.]  Dr. Heflin signed off to acknowledge Dr. Padhye's Report, but his "[r]ecommendation after review," was to take "no further action."  [Filing No. 38-2 at 65.]

     5.     *Prison Medical Staff Deny Mr. Rose Access to Nucala Injections*

On October 25, 2022, the day after Mr. Rose saw Dr. Padhye, a nurse updated Mr. Rose's medical chart.  [Filing No. 91-1 at 45.]  The chart update stated that Mr. Rose "smokes 23.00 packs a year."  [Filing No. 91-1 at 45.]  The chart update further showed that Mr. Rose's medications did not include Spiriva, Cetirizine, Azelastine, or Nucala injections, all recommended by Dr. Padhye.  [Filing No. 91-1 at 45-46.]

The next day, just after midnight on October 26, 2022, Mr. Rose visited a nurse to receive a nebulizer treatment.  [Filing No. 91-1 at 47.]  The nurse wrote that "in [the] patient's words," Mr. Rose felt like "he can't breath[e]."  [Filing No. 91-1 at 47.]  After the nebulizer treatment, Mr. Rose stated that he was breathing easier.  [Filing No. 91-1 at 47.]

Later that day, Dr. Heflin saw Mr. Rose and noted that Mr. Rose's "symptoms ha[d] worsened" and that his condition was "moderately severe."  [Filing No. 38-2 at 72.]  Besides listening to Mr. Rose through a stethoscope, though, Dr. Heflin's treatment notes do not show that he tested Mr. Rose's lung capacity, the effective age of his lungs, spirometry values, FeNo testing, or any other testing conducted or recommended by Dr. Padhye.  [*See* Filing No. 38-2 at 72-73 (noting that respiratory auscultation was normal).]  That same day, Dr. Heflin submitted a Formulary Exception Request so that Mr. Rose could gain access to Nucala injections.  [Filing No. 96 at 64.]  A formulary exception request is "submitted when medications are prescribed to patients that are not included in" the "list of approved medications" for Defendant Centurion Health

Services, LLC, the medical provider for IDOC.  ("Centurion") [Filing No. 91-5 at 2-3.]  In the Request, Dr. Heflin wrote that "[a]llergy testing showed severe reaction[s] to numerous allergens," that his lung capacity was 55%, and that Dr. Padhye recommended Nucala.  [Filing No. 96 at 64.] Dr. Heflin noted that Mr. Rose had been taking Albuterol, Nasacort, and Singulair, but he nonetheless suffered from "severe persistent asthma."  [Filing No. 96 at 64.]

Dr. Heflin discussed the Formulary Exception Request with Defendant Dr. Kate Wilks, Centurion's then-Associate Statewide Medical Director and "Site Medical Director" for CIF. [Filing No. 91-3 at 4; Filing No. 91-1 at 107.]  Also involved in the discussion was Nurse Tina Collins, another medical provider working at CIF.  [Filing No. 91-3 at 4.]  This discussion continued at least in part over email:

| | |
|---|---|
| **Dr. Wilks:** | "[H]ow many hospitalizations or periods of steroid use has [Mr. Rose] had in the last 6 months?" |
| **Dr. Heflin:** | "No hospitalizations in 6 months.  Two rounds of steroid use in the past 6 months." |
| **Dr. Wilks:** | "Does that qualify him for severe asthma?  Isn't the biologic [Nucala] for severe asthma?" |
| **Nurse Collins:** | "Is severe asthma something that changes anything?  As in, should I be doing anything more than having him seen more frequently due to uncontrolled/poorly controlled allergies? . . . Another part of this.  I am pretty sure the asthma is onset by allergen complaints alone. . . . [N]ursing had to repeatedly encourage him to come over to utilize breathing treatments vs. just complain about his symptoms alone.  Most of his assessments for 'worsening symptoms' are based on patient reports alone as well. . . ." |
| **Dr. Wilks:** | "I agree.  It doesn't sound like he has severe symptoms.  [At this point] for the Nucala – Dr. Heflin, I would recommend utilizing the current therapies for this [patient] . . . ." |

[Filing No. 91-1 at 65-67 (email chain from October 27-31, 2022).]

8

Dr. Wilks concluded that Mr. Rose "had not exhibited signs of severe respiratory distress that would support approval of" Nucala injections. [Filing No. 91-4 at 2.] Based on that conclusion, on October 31, 2022, Dr. Wilks denied the Formulary Exception Request. [Filing No. 91-3 at 4.] This email chain available in the record did not discuss the findings of allergy specialist Dr. Padhye. [Filing No. 91-1 at 65-67.]

### 6.    Mr. Rose's Asthma Symptoms Continue to Worsen

On November 11, 2022, Mr. Rose visited a nurse shortly after midnight and complained about his allergies. [Filing No. 91-1 at 68.] The nurse documented his complaint "in [the] patient's words" as "I need to talk to the Dr. to find out why I'm not getting the medication that the allergy specialist recommended." [Filing No. 91-1 at 68.]

On November 16, 2022, Dr. Heflin saw Mr. Rose again and noted that his "symptoms have worsened and occur frequently" and that Mr. Rose continued to wake with a cough and wheeze with exercise. [Filing No. 96 at 72-73.] Dr. Heflin wrote that Mr. Rose's condition was "moderately severe." [Filing No. 96 at 72-73.] That same day, Nurse Collins updated Mr. Rose's "physical health status classification" to level F, reflecting that Mr. Rose had a "[p]hysical health condition (including chronic care) requiring frequent monitoring/surveillance and the on-site availability of licensed health care personnel twenty-four hours per day" and that Mr. Rose may be "frail and debilitated." [Filing No. 96 at 75-77.] On December 6, 2022, Mr. Rose's health appeared to have stabilized as "very severe." [Filing No. 96 at 78.]

Only a month later, on January 3, 2023, Mr. Rose again complained of worsening symptoms and filed a request for healthcare for a second opinion beyond Dr. Padhye's. [Filing No. 1-1 at 152.] He stated that he was "sick and tired of not being able to breathe." [Filing No. 1-1 at 152.] This request was "referred to MD." [Filing No. 1-1 at 152.]

### 7.    *Dr. Heflin's Treatment Plan Stops Working*

On January 19, 2023, Dr. Heflin saw Mr. Rose and wrote that "[t]he symptoms have worsened" and that Mr. Rose's condition had become "very severe." [Filing No. 96 at 83.] He wrote that Mr. Rose's breathing had "worsened over the past month," that there was "[i]ncreased shortness of breath and wheezing," and that "[i]nhalers [were] not working as well." [Filing No. 96 at 83.] Listening to Mr. Rose's lungs alone, though, showed respiratory signs as normal. [*See* Filing No. 96 at 84 (noting that respiratory auscultation was normal).] Dr. Heflin planned to schedule Mr. Rose for pulmonary function testing. [Filing No. 96 at 84.]

Shortly after midnight on January 27, 2023, Mr. Rose visited a nurse for another nebulizer treatment. [Filing No. 91-1 at 92.] Before the nebulizer treatment, testing indicated "coarse rhonchi" sounds in both of his lungs and a peak flow of only 320 liters per minute. [Filing No. 91-1 at 92.] After the nebulizer treatment, he started breathing easier and his peak flow improved, but only to 500 liters per minute. [Filing No. 91-1 at 92.] He came back for treatment later that day around 1:30 p.m., where before treatment his peak flow was only 280 and after treatment his peak flow was only 480. [Filing No. 91-1 at 96-97.] Sometime that day, Mr. Rose filed yet another request for health care to see a pulmonary specialist, noting his recent string of low peak flow rates. [Filing No. 1-1 at 154.] He stated that "it [was] beyond obvious that [his] current 'treatment plan' [was] proven ineffective." [Filing No. 1-1 at 154.] He complained that "all recommendations from Dr. Padhye . . . had gone ignored. [He was] tired of not being able to breathe." [Filing No. 1-1 at 154.] Prison staff responded a few days later that he was "already scheduled to see the provider" and to discuss his concerns at that appointment. [Filing No. 1-1 at 154.] Sometime that same day, Dr. Heflin reviewed Mr. Rose's recent lung-testing data. [*See* Filing No. 96 at 86 (showing Dr. Heflin's signature at the bottom).] Circled on the document was Mr. Rose's FEV1 on the line showing 39%. [Filing No. 96 at 86.] Although the document noted that computer

interpretations could not be "relied upon for diagnosis," the "suggested interpretation" was still "severe restriction." [Filing No. 96 at 86.]

On January 31, 2023, Dr. Heflin saw Mr. Rose again and wrote that Mr. Rose's symptoms had again worsened and that it had become "very severe." [Filing No. 96 at 89.] Dr. Heflin's "provider plan" indicated that because Mr. Rose had "worsening asthma [that was] not responding to treatment," he would "make [a] pulmonologist referral." [Filing No. 96 at 90.] The pulmonology consultation request was sent out that same day, with a notation that Mr. Rose's recent FEV1 lung capacity test showed only 39%. [Filing No. 96 at 93.][5]

On February 23, 2023, Mr. Rose underwent x-rays on his chest. [Filing No. 91-1 at 263.] The reason for the x-ray was shortness of breath, asthma, and "hemoptysis," the medical term for coughing up blood. [Filing No. 91-1 at 263.] The x-ray revealed that Mr. Rose's lungs had "[d]iffuse interstitial prominence suggest[ing] chronic change." [Filing No. 91-1 at 263.] Dr. Heflin, as the referring physician, signed his name acknowledging the results. [Filing No. 91-1 at 263.]

### 8. Pulmonologist Dr. Moayyed Moallem Notes that Mr. Rose's Asthma is Poorly Controlled

On March 9, 2023, Mr. Rose saw Pulmonologist Dr. Moayyed Moallem, who noted that Mr. Rose's asthma was "[m]oderate[ly] persistent" and "poorly controlled." [Filing No. 96 at 102.] Dr. Moallem recommended adding the medication Spiriva, and he agreed with Dr. Padhye's assessment that Mr. Rose would benefit from Nucala injections but noted that might be "unrealistic while incarcerated." [Filing No. 96 at 102.] Although Dr. Moallem had not seen the results of Mr.

---

[5] The lung test that the parties refer to show that the test was conducted in 2006, nearly 20 years earlier, but the date of January 27, 2023, is written and signed. [Filing No. 96 at 86.] The parties do not appear to dispute that the actual date of the test was more recent, so the Court narrates the Statement of Facts with this understanding. [Filing No. 96 at 86.]

Rose's x-rays, he recommended that "if abnormal," "[t]he prison need[ed] to follow up" "to get a chest CT scan." [Filing No. 96 at 102.]

9.    *Mr. Rose Starts Coughing up Blood*

In April 2023, Mr. Rose filed multiple grievances, including grievances #153906, #153955, and #154655, contesting his care and raising the issue of his coughing up blood. [Filing No. 1-1 at 27-41.] Through these grievances, Mr. Rose interacted with Defendant David Gobber, a Health Services Administrator employed by Centurion at CIF. [Filing No. 91-7 at 1.] Mr. Gobber worked in this capacity between June 25, 2022, and April 30, 2023. [Filing No. 91-7 at 1.] Mr. Gobber states that he "helped manage the administrative functions of the medical unit at CIF, including but not limited to personnel and scheduling matters." [Filing No. 91-7 at 1.] Mr. Gobber has no medical training, and his role did not include providing medical services. [Filing No. 91-7 at 1.] He would "at times be asked questions by a Grievance Specialist employed by IDOC regarding medical-related grievances filed by offenders" like Mr. Rose, but his role did not include "formally responding to any such grievances." [Filing No. 91-7 at 1-2.] Instead, when he received inquiries from the Grievance Specialist regarding Mr. Rose, he would "consult with [Mr.] Rose's treating medical providers and provide the information [he] received from the providers." [Filing No. 91-7 at 2.] "After receiving [his] responses to their questions, the Grievance Specialist was responsible for formally responding to an offender's grievance." [Filing No. 91-7 at 2.] "None of the responses [he] provided to inquiries from the Grievance Specialist relating to any of [Mr.] Rose's medical-related grievances were based on [his] own acumen or ability," but depended on "information [he] received from [Mr.] Rose's medical providers." [Filing No. 91-7 at 2.]

On April 6, 2023, Mr. Rose filed a grievance, #153906, complaining that his symptoms were not improving and that he was not receiving adequate medical attention. [Filing No. 1-1 at 27.] He noted that he had a 39% FEV1 score, that Dr. Moallem determined his asthma was "not

in control" and that he was supposed to undergo a CT scan of his lungs.  [Filing No. 1-1 at 27.]

He requested to be transferred to the New Castle Correctional Facility, which had better facilities

and medical personnel.  [Filing No. 1-1 at 27.]  He also requested that "[r]ecommendations from

both specialists [be] followed," including adding Spiriva and Nucala injections.  [Filing No. 1-1 at

27.]

Early on April 9, 2023, shortly after midnight, Mr. Rose visited a nurse complaining "in

[the] patient's words" that he was out of breath and that he needed breathing treatment.  [Filing

No. 91-1 at 158.]  Under the "subjective" notes, the medical record states that Mr. Rose was

"coughing out blood [s]tained sputum."  [Filing No. 91-1 at 159.]

Later in the day on April 9, 2023, Mr. Rose filed another grievance, #153955, because he

felt he was forced to wait too long for a nebulizer treatment the previous day.  [Filing No. 1-1 at

32.]  He wrote that while waiting for his treatment, he started coughing up blood, and two

correctional officers witnessed it.  [Filing No. 1-1 at 32.]  Later, a third correctional officer asked

for confirmation that Mr. Rose had coughed up blood, so in front of the first correctional officer,

Mr. Rose "coughed into a napkin . . . and out came a chunk of blood."  [Filing No. 1-1 at 32.]  Mr.

Rose complained that an hour later, only after coughing up blood, was he able to receive his

nebulizer treatment.  [Filing No. 1-1 at 32.]  In his grievance, Mr. Rose wrote that he was afraid

he would not make it out of prison alive.  [Filing No. 1-1 at 33.]

The next day, on April 11, 2023, a grievance official denied grievance #153906, relying on

Mr. Gobber's report that "[p]er visit with provider [Dr. Heflin] on 11/16/22, provider noted

symptomatic relief with utilization of prescribed inhalers.  Nucala Allergy injections were deferred

to an Alternative Treatment Plan. . . . Per provider, patient is being treated optimally for his current

conditions. . . . [N]o transfer is being considered at this time."  [Filing No. 1-1 at 29.]

13

Mr. Gobber's report was not a complete account of Mr. Rose's visit with Dr. Heflin on 11/16/22. [Filing No. 91-1 at 70.] At that appointment, Dr. Heflin noted that Mr. Rose's "symptoms have worsened and occur frequently" and that Mr. Rose continued to wake with a cough and wheeze with exercise. [Filing No. 96 at 72-73.] Dr. Heflin wrote that Mr. Rose's condition was "moderately severe." [Filing No. 96 at 72-73.] That was also the day that Nurse Collins updated Mr. Rose's "physical health status classification" to level F, reflecting that Mr. Rose had a "[p]hysical health condition (including chronic care) requiring frequent monitoring/surveillance and the on-site availability of licensed health care personnel twenty-four hours per day" and that Mr. Rose may be "frail and debilitated." [Filing No. 96 at 75-77.]

Mr. Rose appealed the denial of grievance #153906 and wrote that "[i]n absolutely no way am I being treated 'optimally' for any condition. I have been on the exact same medication for nearly two years; I have made zero improvements, but rather, my health has been on the decline." [Filing No. 1-1 at 30.] He criticized the fact that Mr. Gobber consulted medical records from November 2022, which was nearly six months ago. [Filing No. 1-1 at 30.] He emphasized his 39% lung capacity and that if he were being treated optimally, "there would be improvements" and that he "would not be getting worse, in pain, and coughing blood. . . . I am simply asking for help. I want to go home alive." [Filing No. 1-1 at 30.]

On April 19, 2023, a Grievance Administrator denied Mr. Rose's grievance #153955. [Filing No. 1-1 at 34.] The Grievance Administrator relied on the report of Mr. Gobber, who spoke with Dr. Heflin. [Filing No. 1-1 at 34.] Mr. Gobber wrote that "[p]er provider, patient is being treated optimally for his current conditions and his condition is being managed appropriately." [Filing No. 1-1 at 34.] Mr. Rose appealed, disputing the idea that he was receiving "optimal health care." [Filing No. 1-1 at 35.] According to Mr. Rose, he questioned Dr. Heflin about Mr. Gobber

14

in the past.  [Filing No. 1-1 at 35.]  Mr. Rose wrote that "[p]er Dr. Heflin at my provider visit, he stated, and I quote, 'Your lungs are shot,'" and that Dr. Heflin said, "if it were up to him," Mr. Rose would receive the treatments recommended by Dr. Padhye and Dr. Moallem.  [Filing No. 1-1 at 35.]  He contested his current care, noting that in 2020, his asthma was "mild" and "under control" then later degraded to "severe[ly] chronic" and "poorly controlled."  [Filing No. 1-1 at 35.]  A different prison official summarily denied this appeal.  [Filing No. 1-1 at 35.]

On April 19, 2023, Dr. Heflin saw Mr. Rose and noted that "[h]e states that . . . he now sometimes coughs up blood."  [Filing No. 91-1 at 174.]  Dr. Heflin noted that Mr. Rose coughed up onto a paper towel "a small speck of something red."  [Filing No. 91-1 at 174.]  Dr. Heflin wrote that it was "[u]nclear if [the] small speck of red fluid expectorated was blood and . . . advised [Mr. Rose] to report if this symptom[] worsens."  [Filing No. 91-1 at 175.]  Dr. Heflin also wrote that recent pulmonary function testing showed Mr. Rose's FEV1 was "63% after albuterol treatment." [Filing No. 91-1 at 175.]

On April 20, 2023, the Acting Warden denied Mr. Rose's appeal from the denial of grievance #153906.  [Filing No. 1-1 at 30.]  The Acting Warden wrote that he reached out to Mr. Gobber "for clarification regarding his response."  [Filing No. 1-1 at 30.]  Mr. Gobber clarified that the November 2022 appointment was simply a milestone event and that on December 6, 2022, Dr. Heflin had "concluded that [Mr. Rose's] symptoms has stabilized."  [Filing No. 1-1 at 30.]  Mr. Gobber wrote that on April 12, 2023, he spoke with Dr. Heflin, who said that Mr. Rose's condition "is and has been managed appropriately since" the encounter on December 16, 2022.  [Filing No. 1-1 at 30.]  Mr. Gobber wrote that he "reviewed approximately 24 Health Care Requests" and "more than 20 clinical encounters dating back to October 2022," and he could "not find one instance" "in which Mr. Rose presented with [complaints of] coughing up blood nor did he mention

this to any nurse or provider before his Grievance dated 4/9/23." [Filing No. 1-1 at 30.] Based on Mr. Gobber's investigation and clarification, the Acting Warden denied Mr. Rose's grievance appeal. [Filing No. 1-1 at 30.]

Mr. Gobber's report was not a complete account of Mr. Rose's visit with Dr. Heflin on December 6, 2022. [Filing No. 91-1 at 76.] Although Dr. Heflin's note states, "The symptoms have stabilized," the very next sentence states, "The severity level is very severe." [Filing No. 91-1 at 76.] Further, Mr. Gobber did not refer to Mr. Rose's April 9, 2023, nurse visit – which occurred at midnight before he filed this grievance – in which the nurse documented his complaint that he was coughing up blood. [Filing No. 1-1 at 30; Filing No. 91-1 at 159.]

According to another grievance filed by Mr. Rose, grievance #154655, Mr. Rose visited Dr. Heflin on April 20, 2023, and asked him why he told Mr. Gobber that Mr. Rose was receiving "optimal" healthcare. [Filing No. 1-1 at 37.] According to Mr. Rose, Dr. Heflin "was quite adamant that he did not say that, nor would he, given the severity of [Mr. Rose's] health condition." [Filing No. 1-1 at 37.] Dr. Heflin allegedly saw Mr. Rose "coughing blood right in his office" and stated that Mr. Rose's lungs were "pretty well shot" and that his asthma was "not responding well" to the current medication regimen that he had been on since 2021. [Filing No. 1-1 at 37.] Mr. Rose emphasized that his health had declined and attached a list of notes from over 30 doctors' appointments documenting his declining health and severe condition. [Filing No. 1-1 at 37-38.]

Later that day, on April 20, 2023, at 11:20 p.m., Mr. Rose visited a nurse for a nebulizer treatment and again complained that he was coughing up blood. [Filing No. 1-1 at 120.] The nurse determined that Mr. Rose's "lungs ha[d] scattered wheezes" and that his "coughing [was] productive – blood tinged sputum." [Filing No. 1-1 at 120.]

On April 25, 2023, Mr. Rose visited a nurse for a scheduled breathing treatment. [Filing No. 1-1 at 122-23.] The nurse noted that Mr. Rose was "coughing up bloody sputum" and specifically noted that "Dr. Heflin [was] aware." [Filing No. 1-1 at 123.] From Dr. Heflin's orders, the nurse provided Mr. Rose with Z-PAK antibotics. [Filing No. 1-1 at 123.]

On April 27, 2023, a Grievance Administrator denied Mr. Rose's grievance #154655, again relying on Mr. Gobber's investigation. [Filing No. 1-1 at 39.] Mr. Gobber wrote that Dr. Heflin denied having had the conversation with Mr. Rose contradicting Mr. Gobber. [Filing No. 1-1 at 39.] Mr. Gobber wrote further that Mr. Rose "has been stating in his grievances that he continually coughs up blood but is not able to manifest that symptom when he presents to medical to this day. [Dr. Heflin] stated that he had a napkin with a tiny red speck on it but was not able to confirm what the speck was. Per [Dr. Heflin], patient is in no immediate danger." [Filing No. 1-1 at 39.] Mr. Gobber's investigation did not refer to the nurse's note from two days earlier confirming Mr. Rose's "blood tinged sputum" and that "Dr. Heflin [was] aware." [Filing No. 1-1 at 123.] Mr. Rose appealed the denial of grievance #154655, questioning Mr. Gobber's integrity and emphasizing that Dr. Heflin saw him cough up blood three times. [Filing No. 1-1 at 40.] This appeal was summarily denied. [Filing No. 1-1 at 40.]

On April 27, 2023, Mr. Rose underwent a chest x-ray. [Filing No. 1-1 at 124.] The radiologist wrote that Mr. Rose's lungs had "prominent markings" either from "expiratory technique or, less likely, interstitial lung disease." [Filing No. 1-1 at 124.] The radiologist recommended following up and potentially administering more pulmonary function testing. [Filing No. 1-1 at 124.] Dr. Heflin signed his acknowledgement of the radiologist's report. [Filing No. 1-1 at 124.]

On April 29, 2023, Mr. Rose visited a nurse for nebulizer treatment and the nurse noted that Mr. Rose had diminished lung sounds. [Filing No. 96 at 151.]

The evening of April 30, 2023, Mr. Rose visited a nurse and complained of coughing up blood all night. [Filing No. 1-1 at 125.] The nurse heard "scattered coarse rhonchi" on Mr. Rose's lungs. [Filing No. 1-1 at 126.] Before receiving treatment, Mr. Rose's peak flow rate was 280 liters per minute, and a minute later when he tried again, it fell to 250. [Filing No. 1-1 at 125.] Mr. Rose received treatment and tried again, but his peak flow rate raised to only 310, an increase of 30 points. [Filing No. 1-1 at 125.] Prior treatments had raised his peak flow rate by 200 points. [Filing No. 91-1 at 97.] The nurse wrote that she personally "watch[ed] [Mr. Rose] cough up bloody sputum with [a] deep cough." [Filing No. 1-1 at 126.]

On May 1, 2023, Mr. Rose filed a request for health care because he completed his Z-PAK antibiotic regimen, but nothing had changed. [Filing No. 1-1 at 167.] He requested that Dr. Heflin conduct "a sputum test to see if there [was] any bacteria growing in [his] lungs." [Filing No. 1-1 at 167.]

On May 5, 2023, Mr. Rose visited a nurse for a scheduled breathing treatment. [Filing No. 91-1 at 223.] Before treatment, Mr. Rose's peak flow rates were 240, 240, and 260. [Filing No. 91-1 at 223.] After treatment, Mr. Rose's peak flow rates were 240, 260, and 260, virtually unchanged. [Filing No. 91-1 at 223.]

A few days later, on May 8, 2023, Mr. Rose saw Dr. Heflin, who noted that Mr. Rose's "symptoms ha[d] not changed" and remained "moderately severe" despite continuing his same medication regimen. [Filing No. 96 at 157.] Pulmonary function testing from this appointment showed Mr. Rose's peak flow at no higher than 260, even after treatment. [Filing No. 96 at 158.] Dr. Heflin again scheduled Mr. Rose for pulmonary testing. [Filing No. 96 at 159.]

On May 11, 2023, Mr. Rose underwent more extensive lung-capacity testing. [Filing No. 1-1 at 130.] The tests revealed that Mr. Rose's health declined even further: his FEV1 score was now down to only 20%, indicating a "very severe obstruction." [Filing No. 1-1 at 130.] Dr. Heflin signed his acknowledgement of the test results. [Filing No. 1-1 at 130.]

On June 8, 2023, Mr. Rose again filed a grievance, #23-146196, complaining about his mistreatment and requesting, among other things, Spiriva, Nucala injections, and allergy shots. [Filing No. 96 at 165.] On June 10, 2023, Mr. Rose refused to come to a scheduled breathing treatment. [Filing No. 91-1 at 248.] He also refused treatments on June 13, 2023. [Filing No. 91-1 at 252.] On June 23, 2023, a Grievance Specialist denied Mr. Rose's grievance, noting that Dr. Wilks denied the request for Nucala "because she did not think he had severe asthma." [Filing No. 96 at 166.] The Grievance Specialist noted that Mr. Rose had refused to come to breathing treatments. [Filing No. 96 at 166.] Mr. Rose appealed the grievance and explained that he refused the breathing treatments because his "ankles were raw from the leg shackles being extremely tight." [Filing No. 96 at 167.] He alleged that he was being treated with "deliberate indifference" and threatened to file a lawsuit. [Filing No. 96 at 167.] His appeal was summarily denied. [Filing No. 1-1 at 46.]

On June 28, 2023, Dr. Heflin prescribed Mr. Rose prednisone to help open his airways and deal with his coughing up blood. [Filing No. 91-3 at 6.]

On July 5, 2023, Mr. Rose filed a request for healthcare, invoking his 20% FEV1 score, severe asthma, and the fact that his providers failed to implement the health regimen recommended by two specialists. [Filing No. 1-1 at 169.] He noted that despite his declining health, he had remained on the same medication for over a year. [Filing No. 1-1 at 169.] Although a later x-ray

and CT scan showed his lungs as clear, his pulmonary function testing remained low.  [Filing No. 91-2 at 1; Filing No. 96 at 212.]

On June 25, 2023, a prison nurse noted that Mr. Rose was still "coughing productive, blood tinged sputum – visualized per nurse while in medical."  [Filing No. 1-1 at 131.]  Three days later, Dr. Heflin saw Mr. Rose and wrote that he was "still coughing up a small amount of blood daily." [Filing No. 1-1 at 135.]

### 10.    A Formulary Exception Request for Nucala is Denied

On July 24, 2023, Dr. Heflin submitted a second Formulary Exception Request for Nucala, writing that pulmonary function testing showed an FEV1 of 40%.  [Filing No. 91-1 at 500.]  This was denied by Dr. Murray Young, Centurion's Regional Medical Director, who stated, "Please ask consultant [Dr. Padhye] for alternative treatment option."  [Filing No. 91-1 at 501.]

### 11.    A CT Scan Shows Mr. Rose Has an Enlarged Heart, But His Treatment Plan Remains the Same.

On August 22, 2023, nearly six months after Dr. Moallem recommended a CT scan, a CT scan showed that Mr. Rose had calcified granulomas[6] and an enlarged heart.  [Filing No. 96 at 208.]  Dr. Heflin signed his acknowledgement of seeing the document.  [Filing No. 96 at 208.]

By September 2023, Mr. Rose remained on largely the same treatment plan, and his pulmonary testing remained low at 27% FEV1, improving to only 31% after treatment.  [E.g., Filing No. 91-2 at 134.]  On September 28, 2023, Mr. Rose filed another request for healthcare from Dr. Heflin, reiterating his poor lung health, that he was still coughing up blood, and that his

---

[6] "A granuloma is an area of tightly clustered immune cells, or inflammation, in your body. They form around an infection or foreign object in your body. They can form almost anywhere, but they're most often found in your lungs.  Granulomas can be a symptom of a chronic condition or an infection." Granuloma, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/24597-granuloma (last visited July 17, 2025).

treatment plan had not changed. [Filing No. 96 at 216.] On October 2, 2023, Dr. Heflin referred Mr. Rose to a pulmonologist. [Filing No. 96 at 216.]

12.    *Mr. Rose Requests an Emergency Preliminary Injunction, then Dr. Riley Recommends New Medications*

On October 10, 2023, Mr. Rose initiated this lawsuit, filing a Complaint alleging, among other claims, that many Defendants, including Dr. Heflin, had been deliberately indifferent to his severe asthma. [Filing No. 1 at 17.]

On November 8, 2023, Mr. Rose visited Dr. Heflin again, and Dr. Heflin's notes describe Mr. Rose's symptoms as "stabilized" into "moderately severe" condition, though a nurse's notes the prior month reflect Mr. Rose stating he was coughing up "marble-sized blood expectorants on [a] daily basis." [Filing No. 96 at 217-20.] Nonetheless, Dr. Heflin's provider plan indicated that a "[r]equest for pulmonology follow[ ]up" was denied "to continue current meds." [Filing No. 96 at 221.]

On November 14, 2023, Mr. Rose filed a Motion for Emergency Injunctive Relief. [Filing No. 8.] He provided a detailed chronology of doctors' visits documenting his declining health and that Dr. Heflin and Dr. Wilks denied him proper healthcare. [Filing No. 8 at 1-4.]

On December 5, 2023, the Court received an affidavit from Defendant Dr. Stephanie Riley, Centurion's Statewide Medical Director who "had authority to approve or deny Formulary Exception Requests." [Filing No. 91-5 at 2-3.] She provided a "summary of current recommendations and [a] response to Mr. Rose's request for Injunctive Relief." [Filing No. 21-2 at 1.] She recommended following up with an allergist to discuss "alternative treatment options if any" and whether there are appropriate alternatives to Nucala injections. [Filing No. 21-2 at 3.] She noted that "if a patient does not have appropriate control with AirDuo and albuterol," then instead of Spiriva, the "preferred alternative for an anticholinergic inhaler would be Tudorza. This

would be in addition to [the] AirDuo and albuterol inhaler." [Filing No. 21-2 at 3.] Dr. Riley stated that she communicated those suggestions to Dr. Heflin the prior day. [Filing No. 21-2 at 4.]

The same day Dr. Riley filed her affidavit in this Court, Dr. Heflin submitted a Formulary Exception Request for Tudorza. [Filing No. 96 at 229.] In the Request, Dr. Heflin explained that Mr. Rose suffered from "[p]ersistent asthma symptoms despite treatments with formulary medications." [Filing No. 96 at 229.] Unlike the Request for Nucala injections, this Request was approved. [Filing No. 96 at 228.] Further, Dr. Riley approved a visit to Dr. Padhye "to provide alternative potential treatment recommendations." [Filing No. 96 at 225.]

### 13.    Mr. Rose Is Transferred to a Different Prison Facility

On January 5, 2024, Mr. Rose was transferred from the CIF to the New Castle Correctional Facility. [Filing No. 97 at 2; Filing No. 91-3 at 1.] This meant that Dr. Heflin was no longer his primary care provider. [Filing No. 91-3 at 1.] Dr. Riley and Centurion were still "charged with providing Mr. Rose with medical care." [Filing No. 49 at 1 (Court ordering Dr. Riley and Centurion to respond to Mr. Rose's motion for a preliminary injunction).]

### 14.    Allergist Dr. Leena Padhye Describes Mr. Rose's Symptoms as Poorly Controlled in Part Due to Poor Medication Regimen

On January 29, 2024, Mr. Rose visited Dr. Padhye. [Filing No. 96 at 241.] During the first visit, she stated that he needed to follow up with her within six months. [Filing No. 38-2 at 65.] It had been over a year. [Filing No. 96 at 241.] She noted that he was not taking Spiriva, the medication that she had recommended. [Filing No. 96 at 238.] She noted that he was previously a smoker and had quit three years ago. [Filing No. 96 at 240.] She examined him and discovered "wheezing at rest," wheezing on "forced exhalation," and "wheezing throughout." [Filing No. 96 at 241.] She wrote in all-capital letters that his breath sounds were "tight." [Filing No. 96 at 241 (emphasis removed).] She conducted spirometry tests, which again showed that Mr. Rose's FEV1

lung capacity was only 39%. [Filing No. 96 at 241.] She concluded that Mr. Rose suffered from "[s]evere airway obstruction." [Filing No. 96 at 241.] She added further that Mr. Rose suffered from "severe significant sensitization with poor symptom control likely partially due to inadequate medication regimen." [Filing No. 96 at 241.]

Dr. Padhye made several recommendations to improve Mr. Rose's condition. [Filing No. 96 at 241.] She indicated that Nasacort was "not effective" and recommended a switch to Fluticasone. [Filing No. 96 at 241.] She made a "strong recommendation for [a]llergen immunotherapy." [Filing No. 96 at 241.] Because his asthma was "steroid dependent," she recommended that he start "biologic therapy when on maximal inhaler therapy." [Filing No. 96 at 241.] For the biologic therapy, she recommended the medication Fasenra or alternatively, her original recommendation for Nucala injections, which she proposed two years earlier. [Filing No. 96 at 242.] Additionally, she prescribed him Tudorza, which Mr. Rose was supposed to use in combination with his other inhalers. [Filing No. 96 at 242.]

### 15. *Mr. Rose Files an Amended Complaint*

On February 6, 2024, Mr. Rose filed an Amended Complaint. [Filing No. 38.] The Court screened Mr. Rose's Amended Complaint, and permitted claims against Dr. Heflin, Dr. Wilks, Dr. Riley, and Mr. Gobber, alleging that they each "exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment." [Filing No. 42 at 3.] The Court also permitted state-law negligence claims against those Defendants and also against Centurion. [Filing No. 42 at 3.]

### 16. *Mr. Rose Pleads with Dr. Riley for Medicine*

On February 8, 2024, Mr. Rose "sent a handwritten letter" to Dr. Riley stating that "as of that date, he had [not] yet seen a doctor or nurse" at the New Castle Correctional Facility. [Filing No. 45 at 7.] He outlined to her his severe allergies, low lung capacity, and referred to Dr. Riley's

earlier affidavit.  [Filing No. 45-1 at 14.]  He noted that "with the direction" of Dr. Riley, he had seen Dr. Padhye for his second visit in January.  [Filing No. 45-1 at 14-15.]  He stated that he was unable to regularly obtain access to medication and that again, Dr. Padhye's recommendations for medical treatment were not being followed, including failing to "start biologic therapy whether [on] Nucala or Fasenra."  [Filing No. 45-1 at 16.]  He wrote that it was his "sincerest hope that we can resolve this matter without further court intervention."  [Filing No. 45-1 at 17.]

On February 9, 2024, a prison nurse emailed Dr. Riley a formulary exception request for Fasenra and albuterol.  [Filing No. 91-2 at 487.]  Dr. Riley forwarded the email to Vince Grattan, Centurion's Director of Clinical Pharmacy, asking about the cost of Fasenra:

> I am not familiar with this medication, or the cost.  Given the presence of severe asthma uncontrolled despite treatment with several medications, would this medication be appropriate, or is there a similar more cost effective medication you would recommend?

[Filing No. 91-2 at 487.]

Director Grattan replied that "Fasenra or alternative med Dupixent will cost a few thousand dollars per dose."  [Filing No. 91-2 at 486.]  On March 1, 2024, prison Pharmacy Nurse Melissa Isaacs stated that "they will not approve the injection."  [Filing No. 91-2 at 485.]

On March 4, 2024, "while finishing up his nebulizer treatment," the treating nurse told him that the prison would "not fill Fasenra due to costing 'several thousand dollars per dose.'"  [Filing No. 45 at 9.]  Additionally, Mr. Rose's AirDuo treatments were cut in half, his albuterol treatment was discontinued, and so were his DuoNeb nebulizer treatments.  [Filing No. 45 at 9.]  The nurse informed Mr. Rose that at that point in time, the only person who had the authority to change Mr. Rose's medication was Dr. Riley.  [Filing No. 45 at 9-10.]  This suggested that she made the decision to reduce or eliminate his medications, which would have contradicted her recommendations she filed before the Court.  [Filing No. 45 at 9-10.]

17.    *Mr. Rose Files a Motion for Emergency Injunctive Relief to Gain Access to a Tudorza Inhaler, Which the Court Grants in Part*

On March 13, 2024, Mr. Rose filed a Motion for Emergency Injunctive Relief, detailing these events. [Filing No. 45.] He requested that the Court order the Defendants to "provide him proper health care for severe persistent chronic asthma and severe allergic sensitization, in accordance with the recommendations from the specialists and/or what is consistent for the level of care for patients with that diagnosis." [Filing No. 45 at 14.]

On June 6, 2024, Mr. Rose coughed up a sputum sample, which when analyzed revealed an infection. [Filing No. 114-1 at 12.] Dr. Riley herself reviewed the "results of [the] respiratory sputum culture." [Filing No. 114-1 at 12.] She stated that "[i]t is notable for 3+normal lower respiratory flora as well as a few candida albicans. [She] suspect[ed] the candida albicans may be colonization related to [the] use of [a] steroid inhaler." [Filing No. 114-1 at 12.]

On July 2, 2024, the Court granted Mr. Rose's Motion for Emergency Injunctive Relief in part. [Filing No. 75.] The Court held that Mr. Rose had a strong likelihood of success on the merits of his claim for deliberate indifference. [Filing No. 75 at 5.] The Court noted that the medications suggested by Dr. Padhye "were not provided. . . . Indeed it does not appear that his treatment regimen changed at all." [Filing No. 75 at 6.] The Court observed that although Dr. Riley "concluded that a Tudorza inhaler can be prescribed," "[i]t [was] unclear from the records, however, whether Tudorza ha[d] been provided to Mr. Rose." [Filing No. 75 at 6.] The Court granted Mr. Rose's Motion for Emergency Injunctive Relief "to the extent that the defendants [would be] directed to provide him with a Tudorza inhaler prescription." [Filing No. 75 at 9.]

18.  *Mr. Rose Files a Motion for an Emergency Injunction for Lung Sputum Testing, Which the Court Grants in Part*

On July 3, 2024, Mr. Rose filed a Motion for Emergency Injunction, which he drafted on June 27, 2024, before the Court ruled on his prior motion.  [Filing No. 79 at 1.]  At the time of writing, Mr. Rose had alleged that his condition had worsened.  [Filing No. 79 at 1.]

Mr. Rose stated that a prison nurse, Nurse Jaekar Teah, had "ordered a sputum test," which Mr. Rose had requested from Dr. Heflin a year earlier when he started coughing up blood.  [Filing No. 79 at 5.]  According to Mr. Rose, on June 24, 2024, a different prison nurse, Nurse Jamie Runyon, "showed [him] those results and stated, 'This is very bad, you have both a yeast and staph infection in your lungs.'"  [Filing No. 79 at 5.]  Mr. Rose asked, "Do you think that's what's causing me to cough blood?"  Nurse Runyon replied, "Without a doubt."  [Filing No. 79 at 5.]

On January 7, 2025, the Court granted Mr. Rose's Motion for Emergency Injunction in part.  [Filing No. 101.]  The Court observed that "[a]lthough he provides no medical records" documenting his alleged lung infection, "Mr. Rose's testimony that he has been suffering from serious breathing problems and has been coughing up blood [was] enough at [that] stage" to show that he would suffer irreparable harm without an injunction.  [Filing No. 101 at 6-7.]  The Court found that "based on the record before the Court, he does not appear to be receiving sufficient treatment."  [Filing No. 101 at 7.]  The Court granted Mr. Rose's Motion "to the extent that the defendants" were required to "provide Mr. Rose with a sputum or other appropriate test to evaluate Mr. Rose for staph, yeast, or other infections in his lungs and" were required "to treat him for any infection that is indicated."  [Filing No. 101 at 8-9.]

19.  *Mr. Rose's Lung Testing Reveals an Infection Requiring Intravenous Treatment*

On January 10, 2025, Mr. Rose coughed up a sputum sample.  [Filing No. 104 at 2.]  Four days passed, but the outside testing laboratory "had not yet received Mr. Rose's sputum sample."

[Filing No. 104 at 2.]  So on January 14, 2025, Mr. Rose coughed up a second sputum sample, "and the healthcare providers at New Castle hand delivered this sample" to a hospital for testing. [Filing No. 104 at 2.]  On January 15, 2025, the testing hospital found that the second sputum sample was "[u]nsatisfactory for culture" and requested another.  [Filing No. 106-1 at 1.]  So on January 16, 2025, Mr. Rose coughed up a third sputum sample.  [Filing No. 106 at 2.]  But that sample was still insufficient for testing.  [Filing No. 106 at 3.]  So on January 17, 2025, Mr. Rose coughed up a fourth sputum sample.  [Filing No. 108 at 3.]  It, too, was insufficient.  [Filing No. 108-2 at 2.]  The Medical Director at New Castle Correctional Facility, Dr. Thomas Millikan, stated that Mr. Rose "made a good faith effort to provide a proper sputum sample but" refused to make further attempts.  [Filing No. 108-2 at 2.]

Mr. Rose explained why he refused further attempts.  [Filing No. 114.]  In a notice filed with the Court regarding his health status, Mr. Rose emphasized that because he had a lung capacity of 39%, it was "extremely difficult to forcibly cough." [Filing No. 115 at 2.]  He explained that "[a]fter several minutes of . . . forcibly coughing deeply, he became short of breath and requested a nebulizer treatment . . . but was denied" because it could contaminate the sample. [Filing No. 114 at 3.]  Mr. Rose's "chest was hurting, he was short of breath, and exhausted; he would not continue to forcibly cough himself into a potential asthma attack and be denied a nebulizer treatment."  [Filing No. 114 at 3.]  Mr. Rose signed a form refusing to produce more sputum because "he was physically unable to do it."  [Filing No. 114 at 3.]

Dr. Millikan explained that "[i]f a proper sputum sample must be obtained from [Mr.] Rose, it [would] likely require that [Mr.] Rose undergo an invasive procedure called a bronchoscopy." [Filing No. 108-2 at 2.]  Dr. Millikan opined that "Mr. Rose's inability to generate a sputum sample

appropriate for testing indicate[d] that he most likely d[id] not have a staph, yeast, or other infection, or any other similar illness, that requires further treatment." [Filing No. 108-2 at 3.][7]

That was incorrect. On February 12, 2025, Mr. Rose "was abruptly admitted into the [New Castle Correctional Facility] infirmary for a severe staff and lung infection." [Filing No. 115 at 3; Filing No. 113-2 at 1.] To fight the infection, Mr. Rose needed infusions of vancomycin every twelve hours for the next seven days. [Filing No. 115 at 3; Filing No. 115-1 at 3.] Mr. Rose believed that vancomycin is one of the "most potent antibiotics in the world, as it attacks bacteria" that strongly resist antibiotics. [Filing No. 115 at 3.] He observed that a minor infection escalated to a dangerous one that the Defendants could have easily prevented with proper testing and prompt antibiotics. [Filing No. 115 at 3-4.] Mr. Rose asserted that if Dr. Heflin had heeded his bloody sputum, and if Dr. Riley had ordered the proper medication, he would not have declined and suffered. [Filing No. 115 at 3-4.]

> 20.    *After Change in Medical Treatment, Mr. Rose's Health Improves*

On June 19, 2025, Mr. Rose filed with the Court an update of his medical condition, to which Defendants have not objected. [Filing No. 124 at 1; Filing No. 125.] Referring to attached pulmonary function testing, Mr. Rose shows that after receiving antibiotic treatment, the capacity of his lungs expanded from 39% to 74.7%. [Filing No. 124 at 8.] This would elevate Mr. Rose's lung capacity to within a few percentage points of what is expected for a man his age. [Filing No. 96 at 259 (according to Dr. Wilks' answer to interrogatories).]

---

[7] The Court later found the Defendants to have satisfied the preliminary injunction to conduct testing. [Filing No. 109.]

21.    *Defendants' Motion for Summary Judgment*

On November 4, 2024, before the Court granted Mr. Rose's Motion for Emergency Injunction to receive lung testing, the Defendants filed a Motion for Summary Judgment and to Relinquish Supplemental Jurisdiction, which is ripe for the Court's consideration.  [Filing No. 90.]

**C.    Discussion**

1.    *Eighth Amendment Claims for Deliberate Indifference to Serious Medical Needs*

"Although the Constitution does not mandate comfortable prisons, it does mandate humane ones." *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  "By prohibiting cruel and unusual punishment, the Eighth Amendment imposes duties on prison officials to 'provide humane conditions of confinement' and 'ensure that inmates receive adequate . . . medical care." *Id.* (quoting *Farmer*, 511 U.S. at 828).  Hence "[p]rison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas*, 2 F.4th at 721-22.  "[T]o prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court begins with the question of an objectively serious medical need.

a.    <u>Objectively Serious Medical Condition</u>

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  "Asthma, depending upon its degree, can be a serious medical condition." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir.

29

2001).  A condition that "causes [an individual] to spit blood is a source of discomfort acute enough to constitute a serious medical need."  *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).  The evidence that Mr. Rose suffers from severe asthma and has coughed up blood "signal[s] a medical need that even a lay person would recognize as serious."  *Greeno*, 414 F.3d at 651 ("vomiting blood").  The Court assumes for purposes of summary judgment that Mr. Rose's asthma and allergies were objectively serious medical conditions.  Defendants do no meaningfully contest that this element is met.

b.    Deliberate Indifference

Defendants argue that their "actions could not be considered negligent, let alone intentional wrongdoing demonstrating recklessness or a total lack of concern for" Mr. Rose's welfare, so Mr. Rose's claims, they maintain, "fail as a matter of law."  [Filing No. 92 at 16.]  Because Mr. Rose must show deliberate indifference by "each named defendant," the Court analyzes arguments defendant by defendant.  *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020).  To orient the discussion, the Court first sets forth the relevant legal background for subjective indifference:

"Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms."  *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).  If a prison official fails to do so, that raises the question of whether he was deliberately indifferent.  *Id.*  "[T]o prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'"  *Johnson*, 5 F.4th at 824 (quoting *Whiting*, 839 F.3d at 662).  Subjective indifference is more than "negligen[ce] in diagnosing or treating a medical condition," but is less than "intentional denial of necessary medical treatment."  *Jones v. Simek*, 193 F.3d 485, 489 (7th Cir. 1999) (quoting *Estell v. Gamble*, 429 U.S. 97, 106 (1976)).  It is a mental state that is equivalent to "reckless disregard" that "approaches intentional wrongdoing."  *Perez*, 792 F.3d at 777

30

("reckless disregard"); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("intentional wrongdoing").

To evaluate a medical professional's mental state, a court uses the "professional judgment standard." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). Under this standard, when a medical professional makes or forgoes medical treatment based on his professional judgment, that decision receives deference and avoids Eighth Amendment liability. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). The reason is that "a doctor who claims to have exercised professional judgment" effectively asserts that he did not disregard the plaintiff's serious medical needs, but rather affirmatively considered them. *Id.* "But deference does not mean that a defendant automatically escapes liability any time he invokes professional judgment . . . . When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't honestly believe his proffered medical explanation," and is just presenting a "post-hoc rationalization," then "summary judgment is unwarranted." *Id* at 805-06. Ultimately, the professional judgment standard asks whether the medical professional's explanation reflects a genuine exercise of professional judgment or is instead a pretext to cover his own reckless disregard of the plaintiff's serious medical needs. *Id.*

"The difficulty is that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'" *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016) (en banc). So "how bad does an inmate's care have to be to create a reasonable inference that a doctor did not just slip up, but was aware of, and disregarded, a substantial risk of harm?" *Id.* The Seventh Circuit has explained that a court can examine "context clues" from the defendant's "treatment decisions (or lack thereof)." *Id.* at 731.

"State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment" or "the defendant's persistence in 'a course of treatment known to be ineffective.'" *Whiting*, 839 F.3d at 663.  It might also include "when a doctor refuses to take instructions from a specialist," *Petties*, 836 F.3d at 729 (citations omitted), or when a doctor "delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez*, 792 F.3d at 777 (citations omitted).  It might further include when the defendant's decisions in some other way "represent[] so significant a departure from accepted professional standards or practices that it calls into question whether the [provider] actually was exercising professional . . . judgment." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (citations omitted).  "In assessing a claim that a prisoner was subjected to such treatment, [a court] look[s] at the totality of an inmate's medical care." *Id.*  (citation omitted).

With the above standard in mind, the Court proceeds to the parties' arguments.

### i.        Dr. John Heflin

Dr. Heflin argues that he was not deliberately indifferent to Mr. Rose's serious medical needs.  [Filing No. 92 at 14.]  He maintains that he did not "objectively observe that [Mr.] Rose's asthma or allergy symptoms had worsened at any time" with regard to his vital signs or oxygen levels, that he "was not told by any CIF medical personnel that anyone else had observed [Mr.] Rose experiencing respiratory distress," and that "[a]ny reference [he] made in [Mr.] Rose's medical records to worsening symptoms . . . was made based only on [Mr.] Rose's subjective reports of his medical condition."  [Filing No. 91-3 at 3.]  Dr. Heflin opines that based on his observations "around and after October 26, 2022," he would describe Mr. Rose's asthma as "moderate," not "severe."  [Filing No. 91-3 at 4.]  Dr. Heflin argues that despite no objective evidence of serious asthma symptoms, he still provided Mr. Rose with medical treatment,

including medication, daily breathing treatments, and referrals to specialists. [Filing No. 92 at 14.] These treatments, Dr. Heflin argues, were "frequently refused" by Mr. Rose himself. [Filing No. 92 at 15.] Dr. Heflin maintains that "when [Mr.] Rose claimed to cough up blood," he still "provided appropriate medical care by ordering an x-ray and CT scan of [Mr.] Rose's chest, each of which showed that [Mr.] Rose's lungs appeared normal." [Filing No. 92 at 15.] Dr. Heflin believes that far from deliberately disregarding Mr. Rose's health, he "took every readily available option to treat [Mr.] Rose's asthma and allergy conditions." [Filing No. 92 at 15.]

Mr. Rose sets forth at least two theories of deliberate indifference against Dr. Heflin beyond isolated treatment decisions: First, he argues that Dr. Heflin "doggedly persist[ed] in a course of treatment known to be ineffective." [Filing No. 95 at 33 (quoting *Greeno*, 414 F.3d at 655).] In support of his claim of dogged persistence, Mr. Rose notes that "[b]etween June 2022 and November 8, 2023, [his] medication regimen did not change," yet his lung function fell to 55% on October 24, 2023, and then fell further to 27% on September 25, 2023. [Filing No. 95 at 33.] He notes further that he began "coughing up blood" on April 9, 2023, and "continued to do so through 2023," and that he "developed a mildly enlarged heart and calcified granuloma[s]," symptoms he had never experienced before. [Filing No. 95 at 33.] He argues that "even a lay person would easily conclude that [his] health was on a decline," yet Dr. Heflin and Dr. Riley "plan[ned] to keep [him] on that same treatment," even though Dr. Heflin himself indicated that "the medication regimen was not effective and even call[ed] it a failure." [Filing No. 95 at 33.] He states that Dr. Heflin, Dr. Riley, and Dr. Wilks all knew his health was in serious decline but persisted in that failing treatment. [Filing No. 95 at 33.]

Second, Mr. Rose argues that Dr. Heflin unconstitutionally "fail[ed] to follow the advice of a specialist," indicating a "conscious disregard of a risk" to his health. [Filing No. 95 at 34

(quoting *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004) and *Zaya*, 836 F.3d at 806).] Mr. Rose states that two specialists provided medical guidance that Dr. Heflin disregarded. [Filing No. 95 at 33-34.] He highlights that Dr. Leena Padhye diagnosed him with "severe persistent chronic asthma" and "severe allergic sensitization," so she prescribed him Spiriva, Cetirizine 10 mg, Azelastine, and Nucala and recommended that he undergo "allergen immunotherapy." [Filing No. 95 at 26.] Mr. Rose argues that Dr. Heflin did not abide by Dr. Padhye's recommendations by submitting a Formulary Exception Request for the non-formulary medications besides Nucala, and in effect denied Mr. Rose access to those medications. [Filing No. 95 at 26; Filing No. 95 at 34.] Mr. Rose states that he saw Dr. Padhye again on January 29, 2024, who diagnosed him with "severe significant sensitization with poor symptom control likely partially due to inadequate medication regimen." [Filing No. 95 at 31.] Mr. Rose states that Dr. Heflin and the other Defendants still did not provide him with an alternative effective treatment plan. [Filing No. 95 at 31.]

As to smoking and missing treatments, Mr. Rose argues that Dr. Heflin cannot point to the record to show he continued smoking, and whenever he missed treatments, it was justified, such as when he was already in pain and "bleeding from leg shackles." [Filing No. 95 at 15-17.] He notes that his FEV1 score had "already decreased from 55% on [October 24, 2022] . . . down to 20% on May 11, 2023," which was "prior to [his] first refusal" of treatment on June 10, 2023. [Filing No. 95 at 14.]

Dr. Heflin replies that he never objectively observed Mr. Rose in respiratory distress and reiterates that "all references he made to [Mr.] Rose's 'worsening' condition were based solely on [Mr.] Rose's subjective reports of his medical condition" and that "objective findings" included "exam data" that was subjective. [Filing No. 100 at 2-3.] Dr. Heflin argues that he did not "blindly stick to [Mr.] Rose's medication regimen," but rather sought additional treatments for him,

including sending him to specialists and submitting a Formulary Exception Request for Nucala. [Filing No. 100 at 3-4.] Dr. Heflin argues that decreases in pulmonary function "with a progressive disease like asthma are natural and expected." [Filing No. 100 at 4.] Dr. Heflin asserts that Mr. Rose simply disagrees with his course of treatment, but prisoners are "not entitled to demand any specific medical care." [Filing No. 100 at 4.]

As the Court has explained, both a (1) refusal to follow a specialist's instructions or (2) dogged persistence in pursuing ineffective treatment can suggest that a doctor was deliberately indifferent. The Court analyzes each theory in turn.

In general, "a difference of opinion between two doctors is insufficient to survive summary judgment on a deliberate-indifference claim." *Zaya*, 836 F.3d at 803. "But when a plaintiff provides evidence from which a reasonable jury could infer that the defendant doctor disregarded rather than disagreed with the course of treatment recommended by another doctor, summary judgment is unwarranted." *Id.* In this context, the distinction, in principle, is simple: when faced with a specialist's advice, did the defendant disagree or did he simply disregard?

A jury can reasonably infer that Dr. Heflin simply disregarded the instructions of specialists Dr. Padhye and Dr. Moallem. *See, e.g.*, *Gil*, 381 F.3d at 663-64 (holding that plaintiff showed genuine issue of material fact of doctor's deliberate indifference when doctor failed to follow specialist's advice, despite doctor's excuse for failure). Dr. Heflin states that around October 26, 2022, he considered Mr. Rose's asthma condition moderate, not severe. A jury could reasonably question whether Dr. Heflin actually believed that when he was faced with evidence from a specialist that Mr. Rose's lung capacity was nearly half that of a healthy person and his lung-age was 79 years old. Dr. Padhye indicated that substitute medications could help Mr. Rose's condition, yet despite Mr. Rose consistently failing to respond to treatment, Dr. Heflin did not file a formulary

exception request for the substitute medication Tudorza until faced with legal action.  *See Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) (holding that "a physician's delay, even if brief, . . . in the face of a known need for specialist treatment may also reflect deliberate indifference").  Dr. Heflin notes that Mr. Rose's CT scan showed his lungs were normal, yet obtusely glances past the finding that Mr. Rose had developed granulomas and an enlarged heart and does not address the fact that an x-ray showed Mr. Rose's lungs to have diffuse interstitial prominence.  A jury could reasonably consider Dr. Heflin to have been cherry picking symptoms that look healthy and to have been deliberately indifferent to the ones that demanded more treatment.

Mr. Rose further alleges that Dr. Heflin persisted with treatment proven to be ineffective.  "Doggedly persisting in an ineffective treatment can establish deliberate in difference."  *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citing *Greeno*, 414 F.3d at 654-55).  That includes "where the defendants repeatedly persisted in offering weak medication despite the inmate's protests that the medication was not working."  *Id.* (citing *Greeno*, 414 F.3d at 654-55).  "[W]hen it [becomes] clear that the [treatment] was not providing" an inmate relief, a doctor can be constitutionally obligated to "explore other options."  *Greeno*, 414 F.3d at 655.  Yet little changed for over a year when Mr. Rose was under Dr. Heflin's care while coughing up blood until the threat of legal consequences preceded Dr. Heflin's application for Tudorza.  The fact that this medical change happened so quickly raises the question of whether improvements to Mr. Rose's medical care could have happened all along and that Dr. Heflin "ignored the gravity of [Mr. Rose's] condition or 'slow-walk[ed]' his treatment plan."  *Reck*, 27 F.4th at 485; *see also, e.g.*, *Thomas*, 991 F.3d at 769 (holding that "failing to provide a very easy treatment or accommodation" can show deliberate indifference "if unnecessary suffering resulted."); *Goodloe*, 947 F.3d at 1031 (reversing summary judgment and ruling in favor of prisoner where defendant doctor "maintained [the same]

course of treatment" for months "even after acknowledging" that the prisoner had shown "no improvement" in his rectal pain and ongoing bleeding); *Greeno*, 414 F.3d at 654-55 (reversing summary judgment and ruling in favor of prisoner where medical defendants failed to conduct necessary tests, ignored specific treatment requests from the inmate, and persisted in offering weak medication—all in the face of repeated protests that the medication was not working).

Dr. Heflin asserts that Mr. Rose continued to smoke. This is relevant because "[e]vidence that a defendant's course of treatment was consistent with other ailments may prove fatal to a deliberate indifference claim." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 616 (7th Cir. 2022). But Dr. Heflin points to no medical documentation showing any effects of alleged smoking on Mr. Rose's health. Instead, the record showcases conflicting testimony and documents. Mr. Rose states that he has not smoked in years, and certain medical records corroborate him. For example, Dr. Padhye noted that he was previously a smoker and had quit three years prior. [*E.g.*, Filing No. 96 at 240.] But some prison nurse documents stated that Mr. Rose "smoke[d] 23.00 packs a year." [Filing No. 91-1 at 45.] And there is medical documentation of his history as working in a coal mine and having COPD. The role of smoking, COPD, and other explanations for Mr. Rose's decline is a question of fact that the jury can consider but it does not warrant summary judgment in favor of Dr. Heflin.

Dr. Heflin argues that Mr. Rose sometimes refused treatment. This is relevant because "when a prisoner chooses not to receive treatment, . . . the doctor is not deliberately indifferent." *Blankenship v. Birch*, 590 F. App'x 629, 633 (7th Cir. 2014) (affirming summary judgment in favor of physician) (collecting cases). But as Mr. Rose explained, the accusations of refusing treatment occurred after the year of failed medical treatment, not during it. Mr. Rose argues that to the extent he refused treatments later, it included instances where it would have been painful to go to receive

his medicine, like when his shackles were painful, and the law does not require Mr. Rose to accept medical treatment that would make him feel even worse. *Cf. Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (giving the inmate "the benefit of the doubt and assum[ing] that he refused to take [medication] because he thought it had been improperly prepared"). By and large, Mr. Rose has pointed to evidence that he consistently adhered to his medical regimen, including midnight visits to the nurse for nebulizer treatments.

Dr. Heflin's remaining arguments understate his constitutional responsibility. He notes that he provided Mr. Rose some treatment and that inmates are not entitled to specific healthcare. But "a prisoner is not required to show that he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). "A doctor who provides some treatment may still be held liable if he possessed a sufficiently culpable mental state." *Zaya*, 836 F.3d at 803. The Constitution does not consign prisoners to simply be grateful for sub-minimal medical care. *See id.* Instead, it permits a jury to reasonably infer Dr. Heflin's culpable mental state by treatment "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 751.

Dr. Heflin defends his professional judgment and ignorance of Mr. Rose's worsening condition by hiding behind a supposed lack of objective findings. There are two problems with this defense. First, medical notes, including Dr. Heflin's own, thoroughly contradict him. Second, the Eighth Amendment does not require objective findings to hold a doctor liable. Beginning with contradictions, one note from Dr. Heflin's visit says "[o]bjective findings," and states that Mr. Rose had "[w]orsening asthma despite treatment with AirDuo, albuterol, singulair, and nasacort." [Filing No. 91-1 at 31.] Other records abound, including from specialist appointments that he ordered, lung-testing reports that he signed his name acknowledging, and notes from prison

nursing staff specifically documenting that "Dr. Heflin [was] aware" that Mr. Rose was "coughing up bloody sputum." [Filing No. 1-1 at 123.] Dr. Heflin characterizes other notes of his as simply reported by Mr. Rose himself, yet a jury could reasonably question this characterization. When Dr. Heflin was treating Mr. Rose and informing Mr. Gobber of his "optimal care," Dr. Heflin's notes once mentioned that Mr. Rose's symptoms had stabilized. Dr. Heflin cannot have it both ways, where suddenly when his notes say Mr. Rose is well, it is Dr. Heflin's word, but when his notes say Mr. Rose is unwell, it is only Mr. Rose's. Further, many doctors' notes over the years distinguished between Mr. Rose's characterizations and those of the attending physician. [*See, e.g.*, Filing No. 91-1 at 47 (nurse writing that "in [the] patient's words," Mr. Rose felt like "he can't breath[e]"); Filing No. 91-1 at 68 (nurse documenting Mr. Rose's complaint "in [the] patient's words"); Filing No. 38-2 at 149 (pulmonologist noting that the "[p]atient is the historian").] A jury could reasonably question why many other medical professionals distinguished between their words and Mr. Rose's, yet Dr. Heflin could not. This kind of "gap in reasoning create[s] a fact dispute on the motivation behind" Dr. Heflin's "prolonged refusal" to provide Mr. Rose with effective medical care. *Ortiz v. Webster*, 655 F.3d 731, 733 (7th Cir. 2011).

Second, the Eighth Amendment does not stop at objective medical findings. "[T]here is no requirement that a prisoner provide 'objective' evidence of his pain and suffering." *Greeno*, 414 F.3d at 655. So "the fact that a condition does not produce 'objective' symptoms does not entitle the medical staff to ignore it." *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996). "[S]ubjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition." *Id.* at 917. In this case, Mr. Rose "repeatedly complained of enduring pain with no modifications in care" until the Court issued two injunctions. *Petties*, 836 F.3d at 731 (citations omitted).

The Court acknowledges that "[w]hen a prison medical professional is accused of providing inadequate treatment (in contrast to no treatment), evaluating the subjective state-of-mind element can be difficult." *Whiting*, 839 F.3d at 662. So the Court "cannot be certain of the conclusion that Dr. [Heflin] actually drew. But state of mind is an 'inquiry that ordinarily cannot be concluded on summary judgment.' " *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (quoting *Mkt. St. Assocs. Ltd. P'ship*, 941 F.2d at 597-98). "[A] jury is entitled to weigh [Dr. Heflin's] explanation against certain clues that the doctor" knew better but did not do better. *Petties*, 836 F.3d at 731 (citations omitted).

Dr. Heflin's Motion for Summary Judgment as to Mr. Rose's Eighth Amendment claim is **DENIED**.

### ii.    Associate State Medical Director Dr. Kate Wilks

Dr. Wilks argues that she did not act with deliberate indifference to Mr. Rose's serious medical needs. [Filing No. 92 at 15.] She avers that "[i]n light of the reports she received from [Mr.] Rose's medical providers, who did not objectively observe that [Mr.] Rose exhibited severe asthma symptoms, [Dr.] Wilks appropriately considered the risks associated with immunosuppressants like Nucala or Fasenra and rejected the [Formulary Exception Request] for Nucala while directing for [Mr.] Rose to remain on his current treatment plan." [Filing No. 92 at 15.]

Mr. Rose argues that Dr. Wilks unlawfully disregarded the opinions of Dr. Padhye and instead improperly relied on the opinion of a nurse practitioner in denying the Formulary Exception Request for Nucala. [Filing No. 95 at 27.] He states that although Dr. Wilks never examined him personally, she deemed his asthma as non-severe and recommended continuing the failing treatment regimen. [Filing No. 95 at 7; Filing No. 95 at 27.]

40

Dr. Wilks argues that Mr. Rose provides no evidence that she "ignored the directions of his asthma and allergy specialist and wrongfully denied [a request] for Nucala." [Filing No. 100 at 4.] Instead, she argues, she "thoughtfully weighed the inherent risks associated with such an immunosuppressant negatively affecting the patient's ability to fight infections with the objective observations reported by [Mr.] Rose's medical providers." [Filing No. 100 at 4.] She argues that this kind of consideration demonstrates she was not deliberately indifferent. [Filing No. 100 at 4-5.]

At least as it pertains to Nucala, the emails in the record show a dispute of whether Dr. Wilks weighed the concerns of specialist Dr. Padhye. Although she demonstrates receiving feedback and considering medical opinions of fellow medical staffers, it is not clear that she is disagreeing with Dr. Padhye's assessment, as the record does not show she was mentioned at all. An alternative inference is that Dr. Wilks' email chain reflects an echo chamber of intentionally disregarding Dr. Padhye's assessment, instead of disagreeing with it. This is a dispute of fact that a jury may consider.

For the remaining treatment concerns, Dr. Wilks does not appear to have directly treated Mr. Rose. Medical notes indicate that she was the Site Director for CIF and hence appears to be a supervisor over Dr. Heflin. This poses potential challenges for Mr. Rose to prove liability during his time at CIF.

"A prisoner may not attribute any of his constitutional claims to higher officials by the doctrine of *respondeat superior*." *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). Therefore, a "supervising prison official" can be held liable under Section 1983 only if "that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). To be held personally responsible, "the official must actually

have participated in the constitutional wrongdoing." *Antonelli*, 81 F.3d at 1428 (citation omitted). But direct participation is different from personal responsibility. Indeed, "a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if [he] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). "That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye . . . . In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Vance*, 97 F.3d at 993 (internal quotation marks omitted).

In this case, the record shows that Dr. Wilks was keenly aware of Mr. Rose's medical care even if she was not his primary physician. Given the allegation that Dr. Heflin was deliberately indifferent – as shown by disregarding specialists, doggedly pursuing ineffective treatment, and improperly delaying testing and treatment – there is a dispute of fact over whether Dr. Wilks turned a blind eye to Dr. Heflin's treatment of Mr. Rose.

Dr. Wilks's Motion for Summary Judgment as to Mr. Rose's Eighth Amendment claim is **DENIED**.

### iii.    Statewide Medical Director Dr. Stephanie Riley

Dr. Riley argues that she was not deliberately indifferent to Mr. Rose's serious medical needs. [Filing No. 92 at 15.] She states that she "was not involved with the evaluation of the October 2022 FER for Nucala." [Filing No. 92 at 15.] She maintains that she was justified in not providing to Mr. Rose the medication "Fasenra, another immunosuppressant injection treatment like Nucala." [Filing No. 92 at 15.] Dr. Riley states that she also approved the additional

medication Cetirizine.  [Filing No. 92 at 15.]  She argues that Mr. Rose simply disagrees with her medical judgment and that any worsening of Mr. Rose's health resulted from his "progressive disease," his refusal of breathing treatments, and his continuing to smoke regardless of what medication or treatment he could receive.  [Filing No. 92 at 15-16.]

Mr. Rose argues that, like Dr. Heflin, Dr. Riley continued following a medical regimen that she knew was not working and ignored the advice of specialists by not approving Formulary Exception Requests for medications like Nucala.  [Filing No. 95 at 34-36.]  Mr. Rose adds that Dr. Riley made "medical treatment decisions based solely upon what [was] 'cheaper and easier' without regard to whether such treatment [was] medically sound."  [Filing No. 95 at 35 (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 242 (7th Cir. 2021)).]  Mr. Rose states that Dr. Riley denied the Formulary Exception Request for another medication, Fasenra, only after discovering that it was too expensive, despite the fact that other medications were not working.  [Filing No. 95 at 35.]

Dr. Riley argues that she did not deny Mr. Rose's access to Fasenra based on cost, and asserts that the "email in which [she] asked about the cost of Fasenra . . . does not state or otherwise suggest that the FER for Fasenra was denied based on cost."  [Filing No. 100 at 4-5.]  Instead, she argues that she denied Fasenra because of its negative effect on his immune system.  [Filing No. 100 at 5.]  She notes that she "nevertheless approved the FER for Cetirizine to provide further treatment for [Mr.] Rose's purported condition."  [Filing No. 100 at 5.]  She argues that her denial of an FER was thoughtfully considered and within the standard of care, not deliberately indifferent.  [Filing No. 100 at 5.]

The Seventh Circuit has held that "[t]he cost of treatment alternatives is a factor in determining what constitutes adequate, minimum level medical care . . . . [B]ut medical personnel

43

cannot simply resort to an easier course of treatment that they know is ineffective." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  A contention that medical officials stated that a treatment was "'too expensive' is a piece of circumstantial evidence that a jury could view as supporting" a claim for deliberate indifference.  *Petties*, 836 F.3d at 733 (en banc).  "If a jury believes that a [medical official] cited cost as a reason for refusing one form of treatment, then it would be reasonable to infer that [the medical official] made other medical decisions in [the prisoner's] case . . . that were dictated by cost, administrative convenience, or both, rather than medical judgment." *Id.*

Mr. Rose has raised a genuine dispute of material fact over whether Dr. Riley contributed to denying him access to Fasenra or other medications because of cost concerns in favor of easier, less effective treatments.  Mr. Rose has presented emails showing Dr. Riley acknowledging "the presence of severe asthma uncontrolled despite treatment with several medications." [Filing No. 91-2 at 487.]  In that same email, she was concerned about costs, asking, "would this medication [Fasenra] be appropriate, or is there a similar more cost-effective medication you would recommend?" [Filing No. 91-2 at 487.]  Clinical Pharmacy Director Grattan stated that Fasenra and its alternative Dupixent would "cost a few thousand dollars per dose." [Filing No. 91-2 at 486.]  Later in the email chain is a note that "they will not approve the injection." [Filing No. 91-2 at 485.]  The email chain does not show her evaluating how effective the medication would be or whether it would harm Mr. Rose's immune system.  Mr. Rose alleges that a prison nurse told him shortly after this email chain that the medication was denied because of its cost.  No substitute was provided.

The denial of Fasenra and its alternative dovetailed with treatment decisions that reflect cost concerns or the same delays and deviations from specialist recommendations allegedly

perpetuated by Dr. Hefin.  Mr. Rose's AirDuo treatments were cut in half and albuterol cut entirely.

He showed evidence that only Dr. Riley could change his medications.  In her affidavit submitted

before the Court, she indicated that it would be important to keep taking those medications yet –

like a nebulizer – those medications inexplicably disappeared.  *See Gil*, 381 F.3d at 664 (reversing

summary judgment in part and remanding in favor of prisoner where the court found potential

deliberate indifference in "prescribing on three occasions the very medication the specialist warned

against").  Further, Dr. Riley stated that Tudorza would have been a good substitute medication,

yet it took a preliminary injunction for Mr. Rose to obtain access to it.  Dr. Padhye noted that Mr.

Rose's condition declined because of a poor medication regimen, yet nothing substantively

changed in Mr. Rose's treatment.  *See Reck*, 27 F.4th at 483 (holding that "when a doctor is aware

of a need to undertake a specific task and fails to do so, the case for deliberate indifference is

particularly strong").  If sputum testing were performed earlier, for example, then Mr. Rose might

not have needed drastic antibiotic intervention.  After the Court ordered sputum testing and Mr.

Rose received antibiotics to treat his infection, within three months, he states that his lung capacity

dramatically expanded.  "The fact that the [sputum test], when finally performed, did lead to

successful treatment makes it all the more obvious that [Dr. Riley] and the other medical staff

should have responded earlier to [Mr. Rose's] requests for further testing."  *Greeno*, 414 F.3d at

655.

Mr. Rose has presented evidence that makes it "reasonable to infer that [Dr. Riley] made .

. . medical decisions in [his] case . . . that were dictated by cost, administrative convenience, or

both, rather than medical judgment," resulting in delays in treatment, persistently ineffective

treatment, and deviations from the advice of specialists.  *Petties*, 836 F.3d at 733 (en banc).  Mr.

Rose has raised a genuine dispute of material fact as to whether Dr. Riley was deliberately indifferent to his serious medical needs.

Dr. Riley's Motion for Summary Judgment is **DENIED**.

### iv.    Health Services Administrator David Gobber

Mr. Gobber argues that "any information that [he] provided in response to an inquiry regarding [Mr.] Rose's medical grievances was made based on the best of his knowledge and the information provided to him by [Mr.] Rose's providers" and that the denial of the grievances did not harm Mr. Rose. [Filing No. 92 at 16.]

Mr. Rose argues that Mr. Gobber was dishonest in responding to his grievances. [Filing No. 95 at 19-20.] He states that Mr. Gobber consulted with his provider but did not note in the grievance response that Mr. Rose's condition had worsened, despite having access to Mr. Rose's medical records. [Filing No. 95 at 19.] He states that Mr. Gobber was further dishonest in accusing him of not being able to cough up blood when he is confronted with medical officials even though Mr. Rose has several documented instances of his coughing up blood. [Filing No. 95 at 20.]

Mr. Gobber argues that he "was not responsible for responding to grievances submitted by any prisoners," and that whenever he was asked for information from Grievance Specialists, he "would consult with [Mr.] Rose's treating medical providers to obtain information necessary to respond." [Filing No. 100 at 5.] He argues that even if he did have access to Mr. Rose's records, Mr. Rose has provided no evidence that Mr. Gobber actually reviewed those records or that he was not entitled to rely on Mr. Rose's treating medical providers. [Filing No. 100 at 5.]

The Seventh Circuit has held that "prison officials who are not physicians themselves are entitled to defer to the medical judgment of staff physicians." *Adams v. Durai*, 153 F. App'x 972, 975 (7th Cir. 2005). "An administrator does not become responsible for a doctor's exercise of

46

medical judgment simply by virtue of reviewing an inmate grievance." *Id.*  And a prison official "who rejects an administrative complaint" on the merits "about a completed act of misconduct does not" violate the Constitution. *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007).  "This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on." *Greeno*, 414 F.3d at 656 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  So the Eighth Amendment standard for deliberate indifference applies to prison officials' actions and inactions only within the scope of their prison duties. *Id.*  Hence an investigating administrator's "failure to take further action once he ha[s] referred the matter to the medical providers" cannot be deliberate indifference. *Id.*

But that is the case for an investigating administrator only if he actually "investigated the complaints." *Id.*  Such an administrator "investigate[s] the situation, ma[kes] sure that the medical staff was monitoring and addressing the problem, and reasonably defer[s] to the medical professionals' opinions." *Johnson*, 433 F.3d at 1010 (affirming summary judgment in favor of grievance specialist).  But it is "a different matter if [an administrator] ha[s] ignored [a prisoner's] complaints entirely." *Greeno*, 414 F.3d at 656.  That would be "shirk[ing] his duty . . . or fail[ing] to appropriately handle the claims." *Id.* at 657.  The Seventh Circuit has agreed with sister-circuit analysis that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Johnson*, 433 F.3d at 1010-11 n.9 (quoting *Spruill*, 372 F.3d at 236).

Mr. Gobber argues that the record does not show that he reviewed Mr. Rose's medical records.  That is false.  Mr. Gobber specifically wrote that he "reviewed approximately 24 Health

Care Requests" and "more than 20 clinical encounters dating back to October 2022," and he could "not find one instance" "in which Mr. Rose presented with [complaints of] coughing up blood nor did he mention this to any nurse or provider before his Grievance dated 4/9/23." [Filing No. 1-1 at 30.] Notably, Mr. Gobber did not refer to Mr. Rose's April 9 nurse visit – at midnight before he filed his grievance, but on the same day – in which the nurse documented his complaint that he was coughing up blood. [Filing No. 91-1 at 159.] And Mr. Gobber provides no explanation for the contradiction between what he reported Dr. Heflin as saying versus what Mr. Rose alleges Dr. Heflin as saying, *e.g.*, "Your lungs are shot." Further, Mr. Gobber does not explain how he somehow missed the very next sentence in a medical note stating that Mr. Rose's condition was severe, not just stable. Juxtaposed with the constant complaints by Mr. Rose, it raises a concern that Mr. Gobber was obligated to ask more questions than he did. These issues raise the concern that he did not appropriately "investigate[] the complaints." *Greeno*, 414 F.3d at 656. "[O]nce an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Perez*, 792 F.3d at 782. Perhaps Mr. Gobber did not want to be alerted to the risk, and so he "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8; *see Perez*, 792 F.3d at 782 (reversing dismissal and ruling in favor of prisoner against grievance officials who "failed to exercise his or her authority to intervene on [the inmate's] behalf to rectify the situation, suggesting they either approved of or turned a blind eye to his allegedly unconstitutional treatment.").

Mr. Gobber's Motion for Summary Judgment as to Mr. Rose's Eighth Amendment claim is **DENIED**.

48

### 2.    *State-law Negligence Claims*

The Defendants argue that because they "are entitled to summary judgment as a matter of law on [Mr.] Rose's federal deliberate indifference claims, the Court should also relinquish supplemental jurisdiction over any of [Mr.] Rose's remaining state law claims in this action." [Filing No. 92 at 16-17.]

Because the Court has denied the Defendants' Motion for Summary Judgment as to the Eighth Amendment claims, the Court also **DENIES** the Defendants' request to relinquish supplemental jurisdiction. And because Defendants did not move for summary judgment on the merits of the state-law negligence claims, those claims shall proceed to trial.

## II.
### MOTION FOR PRELIMINARY INJUNCTION, [111], AND MOTION TO RECONSIDER, [114]

On February 5, 2025, Mr. Rose filed a Motion for Preliminary Injunction to compel Defendants to provide him with a bronchoscopy to detect potential lung infections and other damage. [Filing No. 111.] On February 13, 2025, Mr. Rose also filed a Motion to Reconsider the Court's prior order indicating that the Defendants complied with a preliminary injunction to conduct lung testing. [Filing No. 114.] Because Mr. Rose ultimately received lung testing, which successfully diagnosed him with a lung infection, this both Motions are **DENIED AS MOOT.**

## III.
### MOTION FOR PERMANENT INJUNCTION

On February 24, 2025, Mr. Rose filed a Motion for Permanent Injunction in which he alleges that since February 2024, medical staff of the New Castle Correctional Facility have denied him "over 100 nebulizer treatments . . . due to Centurion having a shortage of nurses. The [prison] does not have an LPN or RN who is stationed there full time." [Filing No. 116 at 11.] He requests, among other things, that the Court compel the Defendants and other Centurion employees to "cease

with their continued denials of any and all medications prescribed and recommended by medical specialists." [Filing No. 116 at 15.]

The Defendants argue in part that "the permanent injunction motion does not seek relief relating to the claims asserted in this case or from appropriate entities." [Filing No. 119 at 8.] They note that Dr. Heflin "no longer has any involvement with [Mr.] Rose's ongoing medical treatment," that Dr. Wilks and Mr. Gobber "no longer work for Centurion," and that Dr. Riley "is not involved in [Mr.] Rose's regular medical care" at the New Castle Correctional Facility. [Filing No. 119 at 9.]

In reply, Mr. Rose argues that Dr. Riley is still the Statewide Medical Director, so it is her "obligation to ensure proper staffing and policy compliance." [Filing No. 122 at 4.]

Mr. Rose's allegations may relate to a claim that "[d]eficiencies in staffing and delays in treatment can give rise to a deliberate indifference claim." *Reck*, 27 F.4th at 489 (citing *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983)). But before addressing the merits, the Court addresses whether Mr. Rose's motion is really one for a permanent injunction or is better understood as a new complaint.

The Supreme Court has observed that "[f]ederal courts sometimes will ignore the legal label that a pro se litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category." *Castro v. United States*, 540 U.S. 375, 381 (2003) (emphasis omitted). "When determining the character of a pro se filing, . . . courts should look to the substance of the filing rather than its label. . . . And what [Mr. Rose] filed is not a [motion for a permanent injunction] but in actuality a separate, unrelated civil action" challenging medical care unrelated to this case's primary allegations. *United States v. Antonelli*, 371 F.3d 360, 361 (7th Cir. 2004) (citations omitted). For example, most of the Defendants are not involved in his latest

missing treatments, his allegations do not relate to them, and his allegations can be resolved without them. The Seventh Circuit has held that "unrelated claims against different defendants belong in separate lawsuits, not only 'to prevent the sort of morass' produced by multi-claim, multi-defendant suits like this one, but also to ensure that prisoners pay all fees required under the Prison Litigation Reform Act, *see* 28 U.S.C. § 1915(b), (g). Complaints like this one from [Mr. Rose] should be rejected, . . . either by severing the action into separate lawsuits or by dismissing improperly joined defendants." *Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011) (quoting *George v. Smith,* 507 F.3d 605, 607 (7th Cir.2007) and citing Fed. R. Civ. P. 21). "Federal Rule of Civil Procedure 21 gives the court discretion to sever any claim and proceed with it separately if doing so will increase judicial economy and avoid prejudice to the litigants." *Wand v. TextBehind*, 2025 WL 303796, at *2 (7th Cir. Jan. 27, 2025) (citation omitted).

But "because paying a second filing fee may impose a substantial financial burden on a prisoner, . . . the court should not sever claims without a plaintiff's consent or acquiescence." *Dorsey v. Varga*, 55 F.4th 1094, 1107 (7th Cir. 2022). Since Mr. Rose will be responsible for the filing fee (and, therefore, an initial partial filing fee) in any new case that is opened, the Court will not open a new case to hear severed claims without his consent.

Mr. Rose's Motion for a Permanent Injunction is **DENIED**. Mr. Rose will have **through August 15, 2025**, to notify the Court whether he wishes for the Court to open a new case for the claims reflected in the subject matter of his Motion for a Permanent Injunction or dismiss them without prejudice. *See Lee v. Cook Cnty., Ill.*, 635 F.3d 969, 971 (7th Cir. 2011) (holding that "[w]hen a federal civil action is severed, it is not dismissed. Instead, the clerk of court creates multiple docket numbers for the action already on file, and the severed claims proceed as if suits had been filed separately.")

## IV.

### CONCLUSION

"Patients are often the best source of information about their medical condition.  A physician's decision to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain and other symptoms can give rise to liability—or, at the very least, raise enough questions to warrant a jury trial.  [Mr. Rose's] case is a good example."  *Goodloe v. Sood,* 947 F.3d 1026, 1027 (7th Cir. 2020).   Mr. Rose has presented enough evidence to raise a jury question that, despite his complaints and requests for treatment, the Defendants each contributed to unlawfully disregarding specialists' instructions, doggedly pursuing ineffective treatment, delaying Mr. Rose's recovery for years, and providing treatment not when it was warranted but only when his condition could no longer be denied.  The disputes of fact for the jury are all the more pressing given that this is the rare deliberate indifference case where the procedural history itself is part of the substantive claim – the Court has steered Mr. Rose's medical care through two injunctions, without which he might have continued wheezing and heaving and coughing up blood.

Mr. Rose's case is not unequivocal: questions remain regarding the role of his potential smoking, COPD, and allegedly refused medical treatments, as well as the Defendants' explanations that they were not negligent but rather applied their professional judgment to his care.  But on this record, "a jury is entitled to weigh that explanation against certain clues that" the Defendants have provided pretexts or post-hoc rationalizations.  *Petties,* 836 F.3d at 731 (citations omitted).  "To avoid summary judgment on his Eighth Amendment claim[s] . . . [Mr. Rose] had to demonstrate the existence of disputed, material issues of fact to proceed to trial.  He did so, in no small part because of his own care and diligence while proceeding pro se."  *Goodloe,* 947 F.3d at 1033.  Defendants' motion, on the other hand, wholly failed to demonstrate the absence of such issues.

Accordingly, the Court rules as follows:

- The Defendants' Motion for Summary Judgment, [90], is **DENIED as to all Defendants**;

- Mr. Rose's Motion for a Preliminary Injunction, [111], and Motion to Reconsider, [114], are **DENIED AS MOOT**.

- Mr. Rose's Motion for a Permanent Injunction, [116], is **DENIED** with instructions to Mr. Rose to notify the Court **by August 15, 2025,** whether he wishes for the Court to open a new case for the claims reflected in the subject matter of his Motion for a Permanent Injunction or dismiss them without prejudice.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of reaching an agreed resolution prior to trial, and if none exists, the anticipated length of trial.

Date: 7/18/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RONALD L. ROSE
213041
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

Jaclyn Michelle Flint
RILEY BENNETT EGLOFF LLP
jflint@rbelaw.com